## ALDRIDGE, (PARKES v.)

[See Parkes v. Aldridge, Case No. 10,755.]

---

## ALDRIDGE, (TURNER v.)

[See Turner v. Aldridge, Case No. 14,249.]

---

## Case No. 157.

### The ALEPPO.

[5 Ben. 554.][1]

District Court, S. D. New York. March, 1872.

COLLISION AT SEA—STEAMER AND BARK — FOG—SPEED—WRONG MANŒUVRE.

1. The bark M. was sunk by a collision with the steamer A., on the 20th of April, 1871, off Boston harbor, in a thick fog. The steamer was bound from Boston to Liverpool, heading about east by south, and going at a speed of at least seven or eight miles an hour. The fog was so dense that objects could not be seen more than fifty yards, and the steamer was blowing her fog whistle at short intervals, and had a lookout stationed on each bow. They reported the bark right ahead, whereupon the steamer's engine was at once reversed, and her helm ported, till she headed southeast half east, when she struck the bark on the port side, cutting in to her main hatch. No sound from the bark was heard on the steamer till after the bark was reported, when the sound of a horn was heard. The bark was heading northeast half east. There was very little, if any, wind. The whistle of the steamer approaching was heard on the bark some fifteen minutes before the collision, and from that time two or three blasts of a fog horn were blown by the bark in response to each blast of the steamer's whistle. Her master, when he saw the steamer, called to her to starboard her helm, and the steamer's lookout also called out "Starboard:" *Held*, that the bark was blowing a proper fog signal, and that the speed of the steamer was the cause of its not being heard till the collision could not be avoided.

[For instances of collision and the precautions necessary to be taken in foggy weather, see The Monticello, Case No. 9,739; The Blackstone, Id. 1,473; The Matteawan, Id. 9,283; The Hammonia, Id. 6,005; The Hansa, Id. 6,037.]

2. That the steamer's speed was too great, and was a fault causing the collision. That, if the steamer had starboarded her helm instead of porting, and swung in the opposite direction as much as she did under her port helm, her direction would have been east northeast, nearly parallel with that of the bark. And that, therefore, the order to port was a wrong one, and contributed to the collision.

In admiralty.

---

[1][Reported by Robert D. Benedict, Esq., and here reprinted by permission.]

J. C. Dodge and T. Scudder, for libellants.
D. D. Lord, for claimants.

BLATCHFORD, District Judge. This libel is filed by the owners of the bark Merrimac, and of her pending freight, and by the owners of property and cargo on board of her, and by her officers and crew, to recover the value of the said bark, and of such freight and property and cargo, and of the effects and clothing of the said officers and crew, and the amount of the wages lost by the said officers and crew, in consequence of the sinking of such bark with said cargo and other property, through a collision which took place between her and the steamship Aleppo, on the 20th of April, 1871, off the harbor of Boston, Massachusetts, in the day time, in a thick fog. The amount claimed by the libel is $134,720.39. About four o'clock on that morning, the bark, which was on a voyage from Montevideo to Boston, made Nansett lights. About half past eleven o'clock, A. M., she was becalmed, so as to lose her steerage way, and a thick fog arose, which continued until the collision. She kept all her sails up except her mainsail and her main-royal. Her yards were braced to the starboard, but there was no wind. When the wind died away it was from about west south-west. At one o'clock, P. M., by sounding, she found twenty-three fathoms of water, with a muddy bottom. Between that time and the time of the collision she did not change her course, and, at the time of the collision, which occurred at twenty-seven minutes past one o'clock, P. M., she was heading northeast half east. The steamer was on a voyage from Boston to Liverpool. The stem of the steamer struck the port side of the bark between the main and mizzen rigging, abreast of the after hatch, the direction of the blow being one point forward of square across, that is, in a direction southeast half east. The side of the bark was crushed in the width of the steamer's bow, and the cutwater of the steamer penetrated to the starboard curbing of the after hatch. The bark sank in from ten to fifteen minutes.

The libel alleges, that the place of collision was about four miles east of Minot's Ledge lighthouse; that the bark was lying dead in the water, wholly becalmed, heading about northeast half east; that the steamer was heading about east by south; that the steamer's whistle was heard for fully fifteen minutes before the collision, and the fog horn of the bark was sounded as required by law, and everything was done on board of the bark, to avoid the collision, that could be done under the circumstances; that the steamship, being under steam, was required by law to keep out of the way of the bark, a sailing vessel, and might easily have done so by observing the rules and precautions which the law and good seamanship required of her; and that the collision and loss

were wholly caused by the negligence of the persons in charge of the steamship.

The answer avers, that the steamer left her dock at East Boston soon after eleven o'clock, A. M.; that, when she left her dock, the weather was somewhat hazy, but not so as to interfere in any way with her navigation until after passing the limits of pilotage waters; that, at about twenty minutes before one o'clock, P. M., she was obliged to stop to replace some packing in one of her engines; that, at one o'clock, P. M., she again proceeded on her voyage, steering about east three-quarters south; that, at that time the wind was light, and the fog, which had begun to thicken very perceptibly soon after she passed Boston lighthouse, became so dense that it was impossible to see objects more than fifty yards distant; that every precaution was taken to avoid accidents, two men were stationed on the lookout, one on each bow, a man was stationed at the steam whistle, which was blown at short intervals, two men were sent to the wheel, to assist the quartermaster who had it in charge, and another quartermaster was stationed at the con, to transmit orders from the bridge, where the captain remained, with the second officer, to see that all hands were attending to their duty; that, by an act of the congress of the United States, sailing vessels are required, whenever there is a fog, whether by day or night, to give warning of their positions by the use of fog horns; that it then was, and, for a long time before the passage of said act, had been, customary for all sailing vessels to blow horns during fogs, as signals of their positions; that the steamer proceeded at half speed, which would have enabled her, without difficulty, to avoid all vessels giving the statutory and customary signals before mentioned, but, although a careful watch was kept, no such signal was heard until a very short time, not three minutes, before the collision, when the lookouts on the forecastle reported a ship right ahead, and close at hand, whereupon the captain instantly ordered the engines reversed and the helm ported, but, before her headway could be stopped, she ran into the bark; that, immediately upon the collision, the officers and crew of the bark got on board of the steamer, and the steamer sent a boat to save what was possible, but the wreck sank before the boat could reach her; that, as the respondents are informed and believe, the steamer's whistle was distinctly heard on board of the bark several minutes before the collision, but no sound was heard from the bark until after she was reported by the steamer's lookouts, when a very faint sound of a horn was heard, mingled with the shouts of the bark's crew; and that the collision was caused by the neglect of those in charge of the bark, either in not having a proper fog horn, or in not blowing it at all, or in not blowing it with strength enough to make it available at the distance at which these horns can usually be heard. The answer denies that the collision occurred except as above stated, or that it was in any measure caused by, or attributable to, any want of good management or proper care on the part of those in charge of the steamer.

It is to be noted, that the answer gives the condition of the weather as a fog so dense that it was impossible to see objects more than fifty yards distant. It does not state the rate of speed of the steamer, but gives it as "half speed," which is shown by the evidence to be a term of art, not meaning half of the ordinary full speed of the vessel, as would naturally be supposed, but only indicating the point at which the throttle-valve of the engine was set, to give steam to the engine. It assigns, as a reason for maintaining whatever rate of speed the steamer did maintain, the fact that no signal of a fog horn from the bark was heard by the steamer. It states that no such signal was heard until a very short time, not three minutes, before the collision; that, when it was heard, the bark was reported as right ahead, and close at hand; and that, before the headway of the steamer could be stopped, by reversing her engines, the collision occurred. Farther on it states that no sound was heard from the bark until after she was reported, when a very faint sound of a horn was heard. The only excuse which the answer sets up, for the failure of the steamer to discharge the duty imposed upon her by law, of keeping out of the way of the bark, is an alleged neglect on the part of those in charge of the bark, in reference to a fog horn. But that excuse is set up in a very loose, indefinite and tentative form of expression. It alleges neglect, either, first, in not having a proper fog horn; or, second, in not blowing it at all; or, third, in not blowing it with strength enough to make it available at the distance at which these horns can usually be heard. What such distance is, is not averred. The entire purport of the answer is, that, as the sound of a fog horn from the bark was not heard on board of the steamer sooner than it was heard, it follows that the fog horn was not a proper fog horn, or was not blown, or was not blown with sufficient strength to make it heard at the distance at which these horns can usually be heard.

The proofs in the case show, satisfactorily, that, about fifteen minutes before the collision, the steamer's whistle was first heard on board of the bark; that, up to that time, no fog horn had been blown on board of the bark; that, as soon as the whistle of the steamer was heard, the mate of the bark procured the bark's fog horn, and blew it, facing with it towards the direction whence the sound of the whistle came, and which turned out to be the direction from which the steamer afterwards came in sight; and that the mate stood, while so blowing, on the port side of the bark, at first on the poop deck, and afterwards on the top of the after house,

and blew two or three blasts of the horn in response to every blast of the steamer's whistle, continuing to so blow until after the steamer came in sight, and until almost the instant of collision. The sound of the fog horn was not heard on board of the steamer until the bark was seen. But, on the evidence, it was the usual fog horn, and was blown in the usual manner, and with customary and proper force. There is nothing to show that its sound was not heard on board of the steamer at as great a distance off as it could be, in view of the speed at which the steamer was going, and the state of the atmosphere and the wind and the fog. A southeast swell was rolling, into which, some three points on her starboard bow, the steamer was plunging at the rate of at least from seven to eight knots an hour, and it is not at all strange that the sound of the fog horn was drowned by the sound of the waves, and of the steamer's motion through the air and through the water, and by the other noises inseparable from the movement, by steam machinery, of a large vessel. The fact that the fog horn was, under all these circumstances, heard when it was heard, and was then heard by a man on the bridge of the steamer, as well as by men on the bow of the steamer, shows that it was a proper horn and was properly blown.

On the evidence, the collision was due to the immoderate speed of the steamer. If her speed had been less, she would have had more opportunity and time, after hearing the fog horn, to take measures to avoid hitting the bark. Her speed was, at least, from seven to eight knots an hour, at the time of the collision, and, I think, was more. She was navigating at that speed, in a dense fog, of the character described in the answer, in a thoroughfare for vessels, some twenty miles only from Boston harbor, and about half that distance from Boston lighthouse. I have considered this question of speed recently so fully in the case of The Hansa, [Case No. 6,-037,] in which the same views were urged and considered which have been advanced by the counsel for the claimants in this case, that I deem it unnecessary to add anything to the views contained in the opinion in that case. Here was a bark, becalmed, in a dense fog, within twenty miles of her destination, properly blowing a proper fog horn, and blowing it precisely in response to blasts of a steamer's steam whistle, and yet the steamer, with all the precautionary measures set up in her answer, was going through the fog at such a rate of speed, that she heard nothing from the bark till the bark was seen, and then it was too late, even with the utmost expedition used in stopping and reversing her engines and porting her helm, to avoid the bark, and the speed was so great, that the bark was severed more than half in two. It would seem to be only necessary to state these premises to reach the conclusion that the steamer was in fault, and solely in fault. Yet, the argument on the part of the claimants advances the proposition, that, even if no fault is imputable to the bark, the collision was the result of an inevitable accident. It was inevitable, probably, at the rate of speed maintained by the steamer. She did not avoid the accident. She probably would have avoided it if she could have done so. In that sense it may have been inevitable. But, in the sense of the rule of law on the subject, this collision was not an inevitable accident. The claimants insist, that the collision was the result of such an accident as could not be avoided by such vigilance and good management as were required by the circumstances of the case. But this proposition is not established by the evidence. On the contrary, it satisfactorily appears, that the collision would have been avoided if the steamer had been going only at such a rate of speed as would have enabled her to stop and reverse, after hearing the fog horn of the bark, or seeing the bark, in season to so check her headway as to put it within her power to stop short of the bark or to turn aside from her.

It is contended, on the part of the libellants, that there was fault on the part of the steamer, contributing to the collision, in porting her helm, when she discovered the bark, instead of starboarding it. The steamer was on a course east three-quarters south. The bark was heading northeast half east. The direction of the blow of the steamer was towards southeast half east, while she was swinging under a port helm. This would show that she had, by her porting, swung two points and three-quarters to starboard. If, by starboarding, at the time she ported, she had swung to port two points and three-quarters from east three-quarters south, it would have brought her to east northeast, at the time of the blow, and she would have been within a point and a half only of being parallel with the bark. I think it is demonstrated by the evidence, in connection with the foregoing facts, that the order to port on the steamer was a wrong one, that the better order would have been to starboard, and that, by starboarding, the collision would probably have been less disastrous. The master of the bark, and the lookout on the steamer, concurred in the conclusion, from their several points of observation, that starboarding was the proper manoeuvre for the steamer, and both of them expressed such conclusion, by shouts to that effect. Yet the steamer ported. There must be a decree for the libellants, with costs, with a reference to a commissioner, to ascertain the damages.

[NOTE. For a subsequent hearing in this case respecting the measure of damages, etc., see The Aleppo, Case No. 158.]